AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

16 AUG 18 PM 1:48

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
A 2016 Wabash tractor trailer, Texas plate 070C247, VIN )
1JJV532D7GL908292 )

Case No.

1:16MJ -484

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the ___Southern___ District of ___Ohio___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841a1 | Possession with Intent to Distribute Heroin, Cocaine, and Marijuana |
| 21 U.S.C. 846 | Conspiracy to Possess and Attempt to Possess with Intent to Distribute Heroin, Cocaine, and Marijuana |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.
☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Christopher A. Brest, Special Agent, FBI
Printed name and title

Sworn to before me and signed in my presence.

Date: __8/18/16__

_____
Judge's signature

City and state: Cincinnati, Ohio

Hon. Karen L. Litkovitz, U.S. Magistrate Judge
Printed name and title

FILED
RICHARD W. NAGEL
CLERK OF COURT
16 AUG 18 PM 1:49

SOUTHERN DIST OHIO
WEST DIV CINCINNATI

## AFFIDAVIT

I, Special Agent Christopher A. Brest, of the Federal Bureau of Investigation, Cincinnati, Ohio, being duly sworn, state:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since March 2010. I have conducted investigations into criminal enterprises, narcotics investigations, organized crime, and violent crimes to include the unlawful possession, possession with the intent to distribute, and actual distribution of controlled substances, as well as the associated conspiracies in violation of Title 21, United States Code, Sections 841(a)(1) and 846. Your affiant has also participated in the execution of federal search warrants and federal arrest warrants in relation to these investigations. Additionally, your affiant has participated in the installation and monitoring of tracking devices for vehicles in order to determine the whereabouts of believed drug traffickers and their illicit merchandise. Your affiant has also been involved with the administrative duties and monitoring responsibilities of Title III Wire intercepts, and analysis of pen registers related to narcotics and gang investigations. Your affiant is familiar with their methods of concealing the whereabouts of their illegal drugs, the methods they use to keep law enforcement officers from finding evidence of drug trafficking operations as well as the methods they use to prevent others unfamiliar with their criminal conduct from observing things indicative of drug trafficking. Your affiant is also familiar with the paranoia surrounding most drug traffickers and the common ways in which wholesale drug distributors attempt to conceal their assets, their purchases, and other financial dealings that could be traced to them.

2. Affiant is currently involved in an investigation of violations of federal controlled substances statutes, to wit: To Knowingly willfully, intentionally, and unlawfully distribute and possess with intent to distribute heroin, cocaine, and marijuana in violation of Title 21, United States Code, Section 841 (a)(1); Conspiracy to distribute and possess with intent to distribute

1

heroin, cocaine, and marijuana in violation of Title 21, United States Code, Section 846.

3. The facts set forth in this affidavit are based on my personal knowledge, information obtained from other law enforcement officers who have personal knowledge of the events and circumstances described herein, and conclusions drawn from my training and experience. Because this affidavit is submitted for the purpose of establishing probable cause in support of the application for search warrants, this affidavit does not set forth each and every fact learned during the course of this investigation.

4. In January, 2014, the Cincinnati Division of the Federal Bureau of Investigation (FBI) and the Cincinnati Police Department (CPD) as a part of the Southern Ohio Safe Streets task Force (SSTF), initiated an investigation into a Drug Trafficking Organization (DTO), headed by Derek Ragan (herein Ragan). Ragan, Woodrow Taylor (herein Taylor), and other members of the DTO are involved in the trafficking of kilogram quantities of heroin, cocaine and marijuana.

5. On August 1, 2016, Title III electronic interception was authorized by the Honorable Susan J. Dlott, U.S. District Court Judge for the Southern District of Ohio, with regard to communications taking place on cellular phone (513)550-6353, utilized by Taylor. Interceptions began on August 2, 2016.

6. During the course of these interceptions, Agents intercepted numerous communications between Taylor and sources of narcotics supply in Mexico. The following conversation was intercepted between Taylor and an unknown male using telephone number 52-656-606-1763 (herein UM1763). Agents believed, based on numerous conversations intercepted, that UM1763 was Taylor's source of supply for cocaine and marijuana. The following conversation between the two was intercepted, which referenced a large quantity of narcotics being shipped to the Southern District of Ohio on or about August 16, 2016:

2

UM: I wanted to tell you that uh, my brother takes off tomorrow. You should know that, right?

WT: Yeah.

UM: And um, there's supposed to be 16 of the first order... going, going, going with him. I just wanted, I just wanted him to be there first because there's gonna be another 11 of the "H", but it's that ugly one. It's that tar, but it's not going to you, it's really going to the wind... the windy city, and my little brother is supposed to just help them out to move them to the windy city, know what I mean?

WT: Right, right. Okay, he told me he needed me to help him do something. Go ahead, I'm listenin'.

UM: Yeah, that might be it. I mean, 'cause, the driver... he don't stop nowhere else but Cincinnati.

WT: Right, right.

UM: We had a, we had an order to go to the windy city with the 11 of that tar, but he can't stop there. So, if you can help him out so we can move them and take them to the windy city to them people it would be real helpful, and whatever they charge, we will pay for that.

WT: Okay, I'll get them up there.

UM: Okay, now one other thing... after this, when it gets here, I guess it will get there by Monday. By Thursday or Friday, I got 3 of those "H", the "china" heading your way.

3

7. I believe, based on my training and experience, as well as my knowledge of this investigation, this call is discussing a shipment of cocaine ("the first order") and tar heroin ("the "H"... the ugly one... that tar"). It is logical to conclude that UM1763 is having his little brother facilitate moving the tar heroin to Chicago ("the windy city"). I further believe Taylor has agreed to help his brother move the heroin to Chicago after it arrives. UM1763 further discusses that "I guess it will get there by Monday. By Thursday or Friday, I got 3 of those "H", the "china" heading your way." It is reasonable to conclude that UM1763 has further shipments of heroin coming to Taylor after this initial load has been delivered.

8. Because of this communication, and several follow up calls, law enforcement conducted surveillance of Taylor beginning at 12:00 a.m. on August 15, 2016 and ended at 2:00 p.m. on August 16, 2016. Surveillance resumed at 5:00 p.m. on August 16, 2016 and was maintained until 2:00 a.m on August 17, 2016. Surveillance again resumed on August 17, 2016 at 9:00 a.m. and ended at 4:15 p.m. on that same day. Surveillance resumed August 17, 2016 at 9:00 p.m. and ended at 11:59 p.m. During this time, Agents identified the "little brother" mentioned by UM1763 as Ivan Ronquillo, and observed him at Taylor's residence multiple times. Intercepted conversations discussed that Ronquillo was staying at Taylor's residence. Agents learned, through intercepted communications, that the shipment being delivered to Taylor was to be only two kilograms of cocaine and four kilograms of tar heroin. Follow up deliveries were to be sent after the first delivery was sold.

9. On August 17, 2016, at approximately 9:00 p.m., surveillance was resumed after coordinating calls between Taylor and Ivan Ronquillo, in which Taylor was set to meet the delivery drivers for the shipment. The pertinent portion of those calls intercepted are as follows:

August 17, 2016 at approximately 9:12 p.m.:

4

IR: Once you're on the 71, take the 19, exit 19 after that.

WT: Okay. At the Golden Corral, right?

IR: Yeah

10. During physical surveillance, writer observed Taylor, in a 2006 Buick Ranier, exit off of North I-71, and head East, turning into the parking lot of Golden Corral. At this time, Agents also observed the Ranier backing into a parking space at the restaurant.

August 17, 2016, at approximately 9:20 p.m.:

WT: Okay, man, what I'm supposed to be doin' bra? I'm sittin' here…

IR: Bout what?

WT: What I'm supposed to be doin', I'm sittin' here. I'm in Golden Corral.

IR: Okay, then. He says that there's a burger joint right there right in front of it. That he went in and actually got a burger there.

WT: Frisch's?

IR: Huh?

WT: Frisch's. So, what you want me to do, you want me to walk over there?

IR: You can drive over there if you want, yeah.

WT: Nah, I'll walk, it's right there… Call him and tell him I'm comin'.

IR: Okay.

August 17, 2016 at approximately 9:31 p.m.:

IR: What's up

5

WT: It's two burger joints, a potbelly and a Frisch's. What is they drivin' bra?

IR: They're in, they're in the truck, so ummm...

WT: A 18 wheeler?

IR: Huh?

WT: A 18 wheeler?

IR: They should be, yeah

WT: I don't see no damn 19 wheeler

11. Writer observed an 18 wheeler tractor/trailer, red cab, white trailer, bearing a Texas license plate 070C247, exit off of North I-71 and head East. The truck was observed parking in a parking lot directly East of Flip Daddy's.

12. The conversation resumes and IR states "It should be the same people."

Later in the conversation:

WT: He by hisself?

IR: Uh, last time I met him, he had his partner, I don't know if he had it with you, when he met it with you, but it could be with one more person.

WT: Oh, when I seen't him he was only with one person. It's the same guy that I met the last time

IR: Yes, because he asked if you was the same guy, so...

August 17, 2016, at approximately 9:34 p.m.:

WT: Yeah

6

IR: Hey, man, he said Flip Daddy's

WT: Flip Daddy's?

IR: Yeah

WT: I don't see no damn Flip Daddy's… I think that's it across the street over there

13. August 17, 2016, at approximately 9:44 p.m., a text message was received by Taylor from Ivan Ronquillo that stated: "I need a verification you good."

August 17, 2016, at approximately 9:52 p.m.:

WT: Yeah

IR: Hey, I'm just checkin' in. Everything good?

WT: Yeah, I'm on my way to the house.

IR: Alright, cool…

14. Upon receipt of this call, Agents utilized marked patrol vehicles of the Ohio State Highway Patrol to do a probable cause stop on the two Hispanic males walking from the Flip Daddy's toward the Red and White 18 wheeler. Both males allowed law enforcement to search the cab of the tractor trailer, but not the trailer of the vehicle. Less than an ounce of methamphetamines was located on one of the males and in a compartment of the vehicle. The two males were arrested on state charges for the methamphetamines and the tractor trailer was escorted by law enforcement to a secure facility.

15. Based on my training and experience as a Special Agent, the experience of other Special Agents, with whom I have conferred, and persons knowledgeable in narcotics trafficking, I know individuals engaged in narcotics trafficking commonly use legitimate business vehicles to further their drug trafficking organization. Based on the information obtained from the

court authorized intercepts of Taylor, your affiant believes that UM1763 was using the truck and tractor trailer to further the DTO.

16. I believe that, based on the above information, and my training and experience, there is probable cause to believe that items described in Attachment B are likely to be found within the truck and tractor trailer further described in Attachment A.

Respectfully submitted,

Christopher A. Brest
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me on this 18 day of August, 2016.

Honorable Karen L. Litkovitz
United States Magistrate Judge

8

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

A 2016 Kenworth truck cab, Texas plate R269476, VIN 1XKYDP9X8GJ110271 and

A 2016 Wabash tractor trailer, Texas plate 070C247, VIN 1JJV532D7GL908292.




1

## ATTACHMENT B

## ITEMS TO BE SEIZED

1. Log books, records, payment receipts, notes and/or customer lists, ledgers, and other papers or electronic record relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

2. Papers, tickets, notices, credit cards receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

3. Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnership, or corporations involved in drug trafficking and money laundering.

4. In addition, all books, records, receipts, credit card receipts and statements, bank statements, and other related financial records, to include: currency, bank checks, money drafts, money orders, cashier's checks, and monetary instruments, including but not limited to stocks and bonds, letters of credit, receipts, passbooks, financial statements, precious metals, coins and bullion, jewelry, vehicle receipts and documents, real estate documents, documents to off-site storage facilities, receipts and rental agreements for storage facilities, safety deposit box keys, storage facility keys, utility bill statements, records of mail and answering services, bulk pre-paid store merchandise cards, logs, and any other items evidencing the obtaining, secreting, transfer and/or expenditures of all monetary transactions for both business and personal purposes;

1

5. Electronic equipment such as pagers, computers, electric organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners, and two-way radios.

6. Computer-related Documentation or other electronic material describing the operation of any the items listed in the Premises to be Searched section above, including instructions on how to access disks, files, or other material stored within same, including but not limited to computer manuals, printouts, passwords, file name lists, "readme" and/or "help files."

7. For purposes of this attachment, the following definitions and inclusions apply:

   A. Records and Information:

   The terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants such as Palm Pilot computers, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

   B. Computer Hardware:

   Computer hardware consists of all equipment which can collect,

2

analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. This includes any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

C. Computer Software:

Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way it works. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs, utilities, compilers, interpreters, and communications programs).

3

    D. Computer-related Documentation:

Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

    E. Computer Passwords and Other Data Security Devices:

Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

8. Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

Indicia of occupancy, residency, and/or ownership of the premises and vehicles including but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, and vehicle registrations,

9. Contraband, such as illegal drugs and other materials, paraphernalia and/or

4